```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------
```

APRIL MAY PIGNONE,

                Plaintiff,

        -v-                                    1:20-CV-5

UNITED PARCEL SERVICE, INC.,

                Defendant.

```
-----------------------------------
```

| APPEARANCES: | OF COUNSEL: |
|---|---|
| MEYEROWITZ LAW FIRM<br>Attorneys for Plaintiff<br>295 Madison Avenue, 22d Floor<br>New York, New York 10017 | IRA SCOT MEYEROWITZ, ESQ. |
| SEYFARTH, SHAW LAW FIRM-NEW YORK<br>Attorneys for Defendant<br>620 Eighth Avenue<br>New York, New York 10018 | ALNISA BELL, ESQ. |
| SEYFARTH SHAW LLP<br>Attorneys for Defendant<br>1075 Peachtree Street Northeast Suite 2500<br>Atlanta, Georgia 30309 | J. STANTON HILL, ESQ. |

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

**I.**     **INTRODUCTION**

Plaintiff April May Pignone ("Pignone" or "plaintiff") brought the present complaint on October 10, 2019, in New York State Supreme Court, Albany County. The complaint asserts three counts: (I) hostile work environment; (II) retaliation; and (III) constructive discharge, all under the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"). In sum and substance, plaintiff alleges that her employer, defendant United States Parcel

Service ("UPS" or "defendant"), subjected her to a hostile work environment by requiring her to work with a supervisor who sexually harassed her on multiple occasions. Plaintiff further alleges that when she complained about her work conditions, defendant retaliated against her, and ultimately made her employment conditions so severe that she had no choice but to resign.

On January 2, 2020, UPS removed the case to this Court, relying on 28 U.S.C. § 1332 for jurisdiction. Defendant is a corporation formed in Ohio with a principal place of business in Georgia, and Pignone is a citizen of New York State. On January 9, 2020, defendant moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6).

## II. **BACKGROUND**

In the summer of 2006, UPS hired Pignone to work in its "Albany Hub" in Latham, New York (the "warehouse"). Dkt. 1-1 ("Comp."), ¶¶ 5-6.[1] Eventually, plaintiff was promoted to the position of Operations Management Supervisor at the warehouse. *Id.* ¶ 5. The warehouse had two distinct operational segments, and each segment had its own manager. *Id.* ¶ 8. The first segment was subject to the oversight of Jon Neroni ("Neroni"). *Id.* ¶ 9. The other was managed by Frank Koncewitz ("Koncewitz"). *Id.* During the relevant events of this case, Neroni was plaintiff's direct supervisor, but Koncewitz still nevertheless outranked her, and had the authority to direct, manage, and terminate her employment. *Id.* ¶¶ 11-12.

Pignone and Koncewitz both worked during the day, plaintiff from 6 a.m. to 12:30 p.m., and Koncewitz from 7 a.m. to 7 p.m. Comp. ¶¶ 14-15. Thus, naturally, the two would periodically cross paths during their workdays. *Id.* ¶ 16. On December 12, 2014, Neroni,

---

[1] The facts are taken entirely from plaintiff's complaint, because for the purposes of a Rule 12(b)(6) motion, this Court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff[.]" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

2

plaintiff, and Koncewitz were in Neroni's office when Koncewitz said to plaintiff "[y]ou look good . . . , seriously, not that you didn't before, but you were getting chunky. Keep it up!" *Id.* ¶ 18. Plaintiff was offended, told Koncewitz that his comment was "mean," and hoped that this would be the last such incident. *Id.* ¶ 19. According to plaintiff, Neroni observed the exchange but remained silent. *Id.* ¶ 21.

On December 16, 2014, Pignone was in her office with her door open at her back. Comp. ¶ 23. She alleges that Koncewitz entered her office, slapped her backside, and said "[l]ooking good!" *Id.* As plaintiff tells it, Koncewitz then flirtatiously invited plaintiff to drive him to his house to pick up his car. *Id.* ¶¶ 25-26. Plaintiff, being deeply uncomfortable and embarrassed, responded that she was working. *Id.* ¶ 27. Because Koncewitz had control over the circumstances of her employment, plaintiff feared reprisal for rejecting his sexual advance. *Id.* ¶¶ 30-31.

On December 17, 2014, Pignone went to Neroni's office. Comp. ¶ 33. She saw through Neroni's window that he was not alone; Koncewitz and three other male UPS employees were with him. *Id.* ¶ 34. Plaintiff was uncomfortable at the prospect of seeing Koncewitz, but nevertheless entered the office. *Id.* ¶¶ 35-36. Allegedly, Koncewitz "put his arms" around her and again slapped her backside. *Id.* ¶ 36. Neroni called plaintiff over to his desk, "apparently to move her away from Koncewitz and to defuse the situation." *Id.* ¶ 39. Meanwhile, plaintiff alleges that Koncewitz made sexually suggestive and generally inappropriate comments. *Id.* ¶ 40.

On December 18, 2014, Neroni called Pignone into his office. Comp. ¶ 46. He asked her what she wanted to do about Koncewitz's harassment and inappropriate touching. *Id.* Plaintiff asked that he be kept away from her, and that Neroni discuss the issue with his and Koncewitz's supervisors. *Id.* ¶ 47.

3

On December 19, 2014, Neroni informed Pignone that he had "handled" Koncewitz. Comp. ¶ 50. Apparently, he and one of his and Koncewitz's supervisors had told Koncewitz that his conduct had made plaintiff uncomfortable and to leave her alone. *Id.* Koncewitz responded "[y]eah right[.]" *Id.* Nevertheless, plaintiff later saw Koncewitz, Neroni, their supervisor, and Jane Faniff ("Faniff"), the warehouse's head of human resources, laughing together over lunch at a restaurant. *Id.* ¶¶ 51-52.

Faniff did not ask for any statement from Pignone or anyone else concerning Koncewitz's behavior until January 21, 2015. Comp. ¶ 55. On that day, plaintiff was called into Faniff's office, at which point Faniff allegedly threatened her that if she heard any more from her about Koncewitz she would sue her for slander and defamation. *Id.* ¶ 57. Faniff also declared that plaintiff had no evidence of any kind of sexually abusive behavior. *Id.* ¶ 59. Nevertheless, Faniff eventually took plaintiff's complaint while sounding complaints of her own at plaintiff's word choices. *Id.* ¶ 63.

Faniff next asked Pignone how she would like to see the situation resolved. Comp. ¶ 64. Plaintiff replied that she never wanted to see Koncewitz again. *Id.* ¶ 65. Plaintiff alleges that Faniff replied that although Koncewitz could not be fired if plaintiff was not willing to press charges, she would see that he was transferred to another UPS warehouse in Amsterdam, New York. *Id.* ¶¶ 66-67. However, he was not actually transferred to Amsterdam until February 27, 2015. *Id.* ¶ 69.

Pignone alleges that her relationship with her coworkers deteriorated after her meeting with Faniff, resulting in her being subjected to "contemptible looks, smirks, laughs . . . and . . . lewd and inappropriate comments[.]" Comp. ¶ 72. At one point, plaintiff was asked to move heavy cases of water bottles alone despite being twenty-six weeks pregnant. *Id.* ¶ 92. In March of 2015, plaintiff claims that an unnamed supervisor ordered her to cover overnight

4

shifts for a week, in place of her usual day shifts. *Id.* ¶ 73. At the end of that week, plaintiff complained of working the overnight shift to Neroni, who responded that she was being permanently reassigned to the overnight shift and would also need to work Saturdays alone going forward. *Id.* ¶ 74.

On March 26, 2015, Pignone complained to Neroni about the change in her work schedule. Comp. ¶ 75. In particular, she stressed that she did not feel safe being in the warehouse alone. *Id.* After all, she alleges that a female employee had been sexually assaulted the year before, and she knew that Koncewitz could come and go as he pleased. *Id.* Neroni allegedly responded that she did not know the story concerning the alleged sexual assault, and that she could not use Koncewitz as an excuse not to work Saturdays. *Id.* ¶ 76. He further told her that she could not change shifts, and if she would not work Saturdays, he would have no job for her. *Id.* ¶ 77. She had never previously been told that she would be fired if she refused to work overnight or on Saturdays alone. *Id.* ¶ 85.

On March 27, 2015, UPS held a mandatory sexual harassment class for all Albany employees. Comp. ¶ 79. The first scenario in the class discussed whether a manager's touching a female employee in the backside constituted sexual harassment. *Id.* ¶ 81. Pignone felt that the class was intended to humiliate her, and she immediately fled crying from the conference room. *Id.* ¶ 82. Marshall Gaye ("Gaye"), one of the instructors of the class, followed her to apologize. *Id.* ¶ 83. He told her that they would discuss her concerns about Koncewitz later. *Id.* ¶ 84. Although this conversation took place, the instructor told her it was ultimately Neroni's decision and he could do nothing to change the situation. *Id.* ¶¶ 85-86.

On July 27, 2016, Pignone informed Faniff that she would be going on maternity leave. Comp. ¶ 94. However, UPS did not pay her six weeks of allowed maternity leave to which she was entitled. *Id.* ¶¶ 94-95. Nor did defendant pay her hospital bills. *Id.* ¶ 96.

While on leave, Pignone learned from one of her coworkers that Koncewitz was once again working in the warehouse in the same role that he had occupied before. Comp. ¶ 97. On September 6, 2016, Gaye confirmed to plaintiff that Koncewitz was, in fact, once again working out of the warehouse. *Id.* ¶ 100. Gaye asked what could be done to fix the problem. *Id.* ¶ 101. Plaintiff responded that she would not be comfortable working in the same building with Koncewitz and did not want to work Saturdays alone knowing he might be there. *Id.* ¶ 102. Gaye replied that he would have to speak to Neroni and get back to her. *Id.* ¶ 103.

On September 9, 2019, Pignone heard back from Gaye, who told her that Neroni said that UPS could not change the situation; plaintiff would have to return to work under the same conditions as before. Comp. ¶ 104. When plaintiff objected to this arrangement, Gaye reassured her that Koncewitz would not be allowed in the building during plaintiff's shift. *Id.* ¶ 106. Despite this reassurance, plaintiff heard from other coworkers that they had seen Koncewitz in the building during the hours she would be working. *Id.* ¶ 107.

On September 12, 2016, Pignone allegedly attempted to resolve the issue by calling the district manager for the Albany office, who said only that he would get back to her. Comp. ¶ 108. He never did. *Id.* Plaintiff's leave ran out on September 13, 2016, and she returned to work. *Id.* ¶ 109. Once there, she learned that Koncewitz was also at the warehouse. *Id.* Afraid of encountering Koncewitz, plaintiff immediately tried to contact Neroni, Faniff, and the district managers, but to no avail. *Id.* ¶ 110.

Instead, Pignone sent an email to Harvey Hill ("Hill"), who she believed to be UPS's highest-level human resources executive in the United States. Comp. ¶ 112. Hill promptly

called her back, offered reassurances that the situation would be resolved, and told her that Amy Madeira ("Madeira"), UPS's Northeast District Human Resources Manager, would be contacting her soon. *Id.* ¶ 116. Madeira called soon afterward, and told plaintiff that, although she should go to work the next day, a Saturday, the situation would be handled and she would not have to work Saturdays alone in the future. *Id.* ¶¶ 118-19. Nevertheless, plaintiff's coworkers told her that Koncewitz continued to work in the warehouse. *Id.* ¶ 121.

On September 20, 2016, Neroni and one of the Albany district managers met with Pignone in Neroni's office. Comp. ¶ 122. The two supervisors appeared to be angry that plaintiff had raised her complaints with ranking human resources employees rather than with them, and told her they were "annoyed by the whole situation." *Id.* ¶¶ 123-24. They further proclaimed that because the building had been deemed safe, she could not claim that she felt otherwise. *Id.* ¶ 125. Moreover, they asserted that if plaintiff would not work Saturdays, there would be no job at UPS for her at all. *Id.* ¶ 127.

Pignone left Neroni's office crying. Comp. ¶ 128. She tried to reach out to Madeira, Hill, and Gaye as she returned to her own office, but received no response. *Id.* ¶¶ 129-30. While plaintiff wept in her office, several coworkers came to offer their support and noted that they each had heard about instances of Koncewitz sexually harassing other employees. *Id.* ¶¶ 130-31. UPS knew of each of these instances, which resulted in the female employees' firing but a decided lack of punishment for Koncewitz. *Id.* ¶¶ 132-33.

Pignone left work at 9 p.m. because she was too distraught to focus. Comp. ¶ 135. While driving home, plaintiff suffered an anxiety attack that culminated in her fainting. *Id.* ¶ 136. On September 22, 2016, Pignone went to the doctor to determine the cause of her fainting spell. *Id.* ¶ 141. The doctor informed her that she fainted because of the severe anxiety and stress caused by working while knowing that Koncewitz could enter the

7

warehouse. *Id.* ¶ 143. As a result, the doctor prescribed that she not return to work until the issue with Koncewitz was resolved. *Id.* ¶ 144. When plaintiff informed Neroni that her doctor recommended that she not return to work, he allegedly angrily responded that it would cost UPS $80,000 and interfere with his records. *Id.* ¶¶ 146-47.

Shortly thereafter, Madeira told Pignone that she would be flying in from Boston to try to resolve the situation and asked to meet her away from the warehouse to discuss it. Comp. ¶ 150. On September 27, 2016, plaintiff met with Madeira, who asked her what could be done. *Id.* ¶¶ 151-52. Plaintiff reiterated that she did not feel safe working in the warehouse while Koncewitz was there. *Id.* ¶ 153. According to plaintiff, Madeira responded that Koncewitz had been told that he was not to go in the warehouse, and that she would remind Neroni to that effect. *Id.* ¶ 154. She also allegedly offered plaintiff an alternate position, working from 5:50 p.m. to 11 p.m. *Id.* ¶ 155. Plaintiff responded that it was not fair that she should have to change her hours unfavorably while Koncewitz did not, especially when the change in hours would not remedy the situation. *Id.* ¶ 164. Madeira asked plaintiff to think about the transfer and told her the offer would remain open. *Id.* ¶ 165.

Even after the meeting with Madeira, Pignone continued to hear from her coworkers that Koncewitz was working in the warehouse. Comp. ¶ 167. On October 24, 2016, plaintiff attended another doctor's appointment, and the doctor recommended that she still not return to work. *Id.* ¶ 170. On November 21, 2016, plaintiff again went to the doctor, who told her that he could not continue to excuse her from work without violating workers' compensation rules. *Id.* ¶¶ 172, 174. Plaintiff had a powerful anxiety attack upon trying to go into work, however, so the doctor wrote her one more week off of work. *Id.* ¶¶ 175, 178. The doctor told plaintiff that come November 28, 2016, she would need to either return to work or quit.

*Id.* ¶ 178. When November 28 came, plaintiff began preparing herself to go to work, but found that she could not while Koncewitz remained. *Id.* ¶¶ 182-83.

As a result, Pignone called Neroni on November 28, 2016, and resigned from her position. Comp. ¶ 183. After plaintiff resigned, UPS refused to pay plaintiff's salary for the nine weeks of work she missed at the doctor's recommendation. *Id.* ¶ 186. Defendant also contested plaintiff's application for workers' compensation pay. *Id.* ¶ 187. Nevertheless, on April 25, 2017, plaintiff received $5,000 in back salary from the workers' compensation board. *Id.* ¶¶ 188-89.

On October 10, 2019, Pignone filed the present complaint in the Supreme Court of the State of New York, in the County of Albany. *See generally* Comp. On January 2, 2020, UPS removed the complaint to this Court, claiming diversity jurisdiction. Dkt. 1. On January 9, 2020, defendant moved to dismiss plaintiff's complaint. Dkt. 8. Plaintiff never responded to defendant's motion. Nevertheless, the motion will now be considered on the basis of the parties' submissions without oral argument.

### III. **LEGAL STANDARD**

"To survive a Rule 12(b)(6) motion to dismiss, the [complaint's] '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, the complaint must contain sufficient factual matter that it presents a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg*, 839 F. Supp. 2d at 540.

If a plaintiff fails to respond to a motion to dismiss, a district court must nevertheless analyze whether the pleadings, standing on their own, survive the motion. *Goldberg v.*

*Danaher*, 599 F.3d 181, 183 (2d Cir. 2010). In other words, "[w]here . . . the pleadings are themselves sufficient to withstand dismissal, a failure to respond to a [Rule 12] motion cannot constitute a 'default' justifying dismissal of the complaint." *Maggette v. Dalsheim*, 709 F.2d 800, 802 (2d Cir. 1983).

## IV. DISCUSSION

UPS's motion to dismiss relies largely on the three-year statute of limitations applicable to NYSHRL claims. *See Barkley v. Penn Yan Cent. Sch. Dist.*, 442 F. App'x 581, 583 (2d Cir. 2011) (summary order). However, defendant additionally argues that Pignone's constructive discharge claim fails as a matter of law because plaintiff rejected alternative transfer offers.

### A. PIGNONE'S HOSTILE WORK ENVIRONMENT CLAIM

"A hostile work environment exists under [the NYSHRL] where the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (reviewing Title VII and NYSHRL hostile work environment claims simultaneously and using the same standard).[2] In deciding whether the environment reached the level of being abusive, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

---

[2] In fact, as a general rule "NYSHRL claims are subject to the same standard as Title VII claims" and will often be considered together with Title VII claims. *See, e.g.*, *Solviev v. Goldstein*, 104 F. Supp. 3d 232, 246 (E.D.N.Y. 2015). One exception, of course, is that in proving causation, the Second Circuit has assumed that a NYSHRL plaintiff must prove that her protected class was a but-for cause of discrimination, while under Title VII a plaintiff need only prove that her class was a motivating factor. *Compare Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 & n.6 (2d Cir. 2010) (assuming without deciding that plaintiff must prove but-for cause for NYSHRL), *with Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) (noting that Title VII discrimination can be proven by lesser, motivating factor standard).

"Facially [sex-]neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Moll*, 760 F.3d at 203 (citing *Alfano*, 294 F.3d at 378). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015).

To prove a hostile work environment claim against an employer for conduct perpetrated by an employee, the "plaintiff[] must show not only severe or pervasive harassment but also 'a specific basis . . . for imputing the conduct that created the hostile environment to the employer.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) (discussing racially hostile work environment under 42 U.S.C. § 1981) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996)); *see Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F. Supp. 2d 404, 419 (W.D.N.Y. 2008) (applying *Whidbee* in Title VII context). One method of proving out the employer's involvement in creating the environment is for a plaintiff to demonstrate that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Van Zant*, 80 F.3d at 715.

However, "[federal] courts (including district courts in this circuit) appear to have uniformly rejected the notion that a failure adequately to remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010). That said, the Second

11

Circuit, although implicitly endorsing the concept in *Fincher*, still has not held outright that a failure to remediate cannot contribute to a hostile work environment claim. *Id.*

UPS argues that Pignone pleads no act by defendant occurring within three years of her filing suit on October 10, 2019. By October of 2016, plaintiff had left work on medical leave. *See* Comp. ¶¶ 141, 143 (plaintiff leaving work on September 22, 2016, because of fainting spells). Her only contacts with defendant after she left work in September were: (1) her meeting with Madeira on September 27, 2016; and (2) her resignation on November 28, 2016. *Id.* ¶¶ 151, 183. The meeting with Madeira occurred beyond the statute of limitations and cannot be considered. *Id.* ¶ 151. Meanwhile, plaintiff's resignation was entirely of her own doing, and defendant played only a passive role in accepting it.

Finally, Pignone cannot argue that UPS's alleged failure to terminate Koncewitz or otherwise address her environment constitutes an affirmative act on defendant's part sufficient to stave off the statute of limitations. *Fincher*, 604 F.3d at 724. Thus, plaintiff has failed to state a cause of action based on any act of defendant within the three-year statute of limitations imposed on NYSHRL claims. Her hostile work environment claim must therefore be dismissed.

### B. **PIGNONE'S RETALIATION CLAIM**

The familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs NYSHRL retaliation claims. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). To make out a prima facie case of retaliation, a plaintiff must make four showings: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006). However, to survive

a defendant's motion to dismiss under Rule 12(b)(6), a plaintiff need plead only "minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311.[3]

Once again, UPS relies on the statute of limitations to oust Pignone's claims of retaliation. On this score, however, defendant's arguments fail. Plaintiff alleges that defendant refused to pay plaintiff her back pay and workers' compensation owed while she was out on medical leave from her resignation on November 28, 2016 until April 25, 2017. Comp. ¶¶ 186-89. A bad faith interference with the payment of workers' compensation could, at this stage, constitute an adverse employment action and substantiate plaintiff's claim of retaliation within the statute of limitations. *See, e.g.*, *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1292-93 (11th Cir. 2002) (ruling that bad-faith refusal to settle a valid a workers' compensation claim can constitute an adverse employment action in retaliation context). However, this allegation is discrete from plaintiff's other claims against defendant, all of which occurred outside the statute of limitations. Thus, plaintiff's retaliation claim only survives to the extent that plaintiff alleges bad faith interference with her workers' compensation claim.[4]

### C. **PIGNONE'S CONSTRUCTIVE DISCHARGE CLAIM**

---

[3] Although *Littlejohn* itself dealt with Title VII and 42 U.S.C. §§ 1981 and 1983, 795 F.3d at 306, courts in this Circuit have applied its principles to NYSHRL claims identically, *see Luka v. Bard College*, 263 F. Supp. 3d 478, 489 (S.D.N.Y. 2017).

[4] Defendant argues that the "continuing violation doctrine," which allows an ongoing scheme of misconduct to bring acts outside of the statute of limitations within their limits so long as a later act is part of the same unlawful scheme, does not apply to retaliation claims. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 301-03 (S.D.N.Y. 2016). This argument seems to misread *National R.R. Passenger Corp. v. Morgan.* 536 U.S. 101 (2002). That case narrowed the definition of the continuing violation doctrine and held that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitute[] a separate actionable 'unlawful employment practice.'" *Id.* at 114; *see Taylor*, 207 F. Supp. 3d at 302 & n.5 (discussing *Morgan*'s narrowing of the continuing violation doctrine). Of course, discrete acts are just that: discrete acts, and thus are not continuing violations. It would take quite a leap from this language, however, to land on the principle that there are no retaliatory acts that are not discrete. Nevertheless, plaintiff's allegations of a refusal to pay workers' compensation are substantially different in terms of the actors involved and the nature of the complaint from any of plaintiff's other claims, and therefore the continuing violation doctrine plainly does not apply to salvage any of plaintiff's other claims.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Whidbee*, 223 F.3d at 73. Constructive discharge "cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of [her] work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993).

Rather, a "plaintiff may prove a constructive discharge by establishing that [her] 'employer, rather than acting directly, deliberately made [her] working conditions so intolerable that [s]he was forced into an involuntary resignation,' *i.e.*, 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998) (providing constructive discharge standard in ADEA context) (citing *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (internal alteration omitted)); *see Gorzynski*, 596 F.3d at 105 n.6 (noting that the "law governing ADEA claims has been held to be identical to that governing claims made under the NY[S]HRL").

UPS argues that Pignone's constructive discharge claim is also time-barred, because she took leave from work for almost two months before finally resigning. This argument ignores the Supreme Court's holding in *Green v. Brennan*. 136 S. Ct. 1769, 1782 (2016). The *Green* Court explicitly held that it is the act of "resignation [that] triggers the limitations period for a constructive-discharge claim." *Id.* Moreover, an employee does not resign until she communicates to her employer her intent to end her employment, regardless of when she last worked for her employer. *Id.*

14

Pignone did not communicate her intention to resign from her position at UPS until November 28, 2016. Comp. ¶ 183. That she did not actively work for several months before that date does not change the only relevant date to the timeliness of her constructive discharge claim: the date that she signaled her resignation. *Green*, 136 S. Ct. at 1782. Defendant's response in the form of citations to lesser courts in earlier years setting the date of discharge at the last day of work cannot sway the analysis. It is therefore plain that plaintiff's constructive discharge claim is timely and cannot be dismissed on this basis.

Alternatively, UPS argues that Pignone's constructive discharge claim fails on its merits because she rejected the offered transfer and did not attempt to find any alternative positions with defendant before resigning. Comp. ¶¶ 150-65. In support of that argument, defendant relies on *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479 (S.D.N.Y. 2000). That reliance is misplaced. Essentially, the Southern District in *Cooper* held that, in the summary judgment context, a plaintiff's failure to even consider proposed alternatives to termination is sufficient to defeat a constructive discharge claim. *Id.* at 495.

The present circumstances are entirely different. Pignone pled in her complaint that she considered the proposed transfer and rejected it for several articulable reasons. Comp. ¶¶ 155-65. Among them, plaintiff objected that the transfer would not alleviate her fundamental concern of working in the warehouse when Koncewitz could appear there. *Id.* ¶¶ 159-61. It would be improper to dismiss the complaint outright in the context of a motion to dismiss where plaintiff has sufficiently pled that she considered other alternatives but that they were not viable. UPS's motion to dismiss plaintiff's constructive discharge claim must therefore be denied.

## V. **CONCLUSION**

The story Pignone's complaint tells is a long one, tracking back years of alleged acts of abuse and mistreatment. Given the temporal breadth of her narrative, it is perhaps unsurprising that some of the acts the complaint alleges fall outside of the three-year statute of limitations imposed on NYSHRL claims. Even so, plaintiff's claims of: (1) retaliation for UPS's alleged bad faith efforts to deny her worker's compensation; and (2) constructive discharge, are cognizable and timely. Those claims must and will proceed.

Therefore, it is

ORDERED that

1. Defendant's Rule 12 motion to dismiss is GRANTED IN PART and DENIED IN PART;

2. Plaintiff's Count I claim for a hostile work environment under the NYSHRL is DISMISSED;

3. Plaintiff's Count II claim for retaliation under the NYSHRL survives only to the extent plaintiff claims bad faith interference with her workers' compensation benefits;

4. Plaintiff's Count III claim for constructive discharge under the NYSHRL survives; and

5. Defendant must answer Counts II and III of plaintiff's complaint on or before Monday, March 30, 2020.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated: March 9, 2020
Utica, New York.